## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

**BARRY L. RICHARDSON,**                )
   Plaintiff                )    Civil Action No. 1:21cv00002
                   )
v.                )    **REPORT AND**
                   )    **RECOMMENDATION**
**KILOLO KIJAKAZI,**[1]                )
**Acting Commissioner of Social**                )    By:  PAMELA MEADE SARGENT
**Security,**                )    United States Magistrate Judge
   Defendant                )

### *I. Background and Standard of Review*

Plaintiff, Barry L. Richardson, ("Richardson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Richardson protectively filed applications for DIB and SSI[2] on June 15, 2018, alleging disability as of June 15, 2017,[3] due to multiple herniated lumbar discs; chronic back pain; a neck injury; a left shoulder injury; ankle swelling; severe anxiety; severe depression; post-traumatic stress disorder, ("PTSD"); nightmares; and nervousness. (Record, ("R."), at 12, 313-16, 319-20, 353.) The claims were denied initially and on reconsideration. (R. at 223-25, 228-30, 233-37, 239-44, 246-48.) Richardson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 249-50.) A hearing was held on February 19, 2020, at which Richardson was represented by counsel. (R. at 38-60.)

---

[2] Richardson filed prior applications for DIB and SSI on November 20, 2014, alleging disability beginning September 7, 2011. (R. at 64.) By decision dated June 14, 2017, an ALJ rendered an unfavorable decision on these claims. (R. at 64-77.) Richardson appealed, but the Appeals Council denied his request for review. Thereafter, he filed an action in this court seeking review of the ALJ's unfavorable decision. *See Richardson v. Berryhill*, Civil Action No. 1:18cv00033 (W.D. Va. July 16, 2018). By Judgment and Order entered December 30, 2019, the Commissioner's decision denying benefits was affirmed. *See Richardson v. Berryhill*, 1:18cv00033, (Docket Item Nos. 17, 18).

[3] Richardson initially reported his alleged onset date of disability as June 10, 2017. (R. at 313, 319.) However, in his decision, the ALJ found June 15, 2017, to be the operative alleged onset date, as this was the day following the date of a prior unfavorable ALJ decision. (R. at 15.)

By decision dated April 15, 2020, the ALJ denied Richardson's claims. (R. at 12-30.) The ALJ found Richardson met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017. (R. at 15.) The ALJ found Richardson had not engaged in substantial gainful activity since June 15, 2017, the operative alleged onset date. (R. at 15.) The ALJ determined Richardson had severe impairments, namely history of left shoulder injury with left rotator cuff bursitis; degenerative changes of the cervical spine; degenerative changes of the lumbar spine with moderately severe bilateral foraminal stenosis at L4-L5 and L5-S1; obesity; anxiety disorder; and depressive disorder, but he found Richardson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-18.) The ALJ found Richardson had the residual functional capacity to perform light[4] work that required lifting and/or carrying no more than 20 pounds occasionally and 10 pounds frequently; sitting for six hours with an option to alternate to standing for 10 minutes during every hour of sitting; standing for four hours with an option to alternate to sitting for 10 minutes during every hour of standing; walking for four hours with an option to alternate to sitting for 10 minutes during every hour of walking; no more than occasional overhead reaching to the left; no more than frequent reaching overhead to the right; no more than frequent reaching to the left and right in all other directions; no more than occasional climbing of ramps and stairs, stooping, crouching, crawling, operating a motor vehicle, interacting with supervisors and co-workers and tolerating occasional changes in a routine work setting; no more than frequent balancing, kneeling and exposure to dust, odors, fumes and pulmonary irritants; and no climbing of ladders, ropes or scaffolds. (R. at

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

18.) The ALJ also found Richardson could perform detailed, but uninvolved, tasks and make simple, work-related decisions; and he could rarely interact with the public, which he defined as less than occasional, but more than never. (R. at 18.) The ALJ found Richardson was unable to perform any of his past relevant work. (R. at 28.) Based on Richardson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Richardson could perform, including the jobs of a garment folder, a folder and a marker. (R. at 29.) Thus, the ALJ concluded Richardson was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued his decision, Richardson pursued his administrative appeals, (R. at 309-10, 421-23), but the Appeals Council denied his request for review. (R. at 1-5.) Richardson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Richardson's motion for summary judgment filed July 26, 2021, and the Commissioner's motion for summary judgment filed August 6, 2021.

## II. Facts[5]

Richardson was born in 1972, (R. at 313, 319), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school

---

[5] The court will focus its discussion on the medical records from the time period relevant to Richardson's claims. To the extent treatment notes outside this period are included herein, it is to provide context or clarity of the record.

education and past work as a truck driver. (R. at 55, 354.) At his hearing, Richardson stated he could not work due to injuries to his neck, left shoulder and low back, as well as depression, anxiety and PTSD. (R. at 42-43.) Richardson stated he had seen Dr. Robertson, a psychiatrist, approximately every two months for the past three and one-half years, for mental health medication management. (R. at 43, 47.) He said he drove himself to these appointments, which was about 45 minutes. (R. at 43-44.) Richardson testified his mental health medications helped him not think as much about harming himself or others, they kept him stable, including controlling his "anxiety breakdowns" he had every two to three weeks, and they had stopped his nightmares. (R. at 44.) He stated that, since the time of his prior hearing in the spring of 2017, he had become more socially withdrawn and more overwhelmed, and he had thoughts of harming himself. (R. at 47-48.) In October 2017, Richardson stated he told Dr. Robertson he felt he was regressing, and things were getting worse. (R. at 48.) He testified that, overall, his depression and anxiety had continued to remain pretty bad, and may have even worsened. (R. at 48.)

Richardson described an average day as watching television and sitting in a recliner with his feet propped up to relieve his back pain for about six out of eight hours. (R. at 44.) He stated he did not really help his wife around the house except to help a little with the cooking. (R. at 45.) He testified he was very withdrawn and did not like being around people. (R. at 45.) Richardson stated he did not like to drive, but he did when he had to. (R. at 45.) He described his low back pain as a constant, dull pain with numbness and tingling down his legs and into his feet, especially on the left. (R. at 46.) Richardson testified he had recently returned to pain management. (R. at 47.)

Richardson estimated he could sit for 15 to 20 minutes before needing to stand for "a little" due to back pain, and he could stand and walk for about 20 minutes. (R. at 49.) He said he used a walking stick on inclines and steps, but not regularly, and he had been prescribed a cane about eight months previously, which he did not use because of his height. (R. at 49.) Richardson, who is right-hand dominant, testified he had left arm weakness, especially with extension and overhead reaching, and he could not fully extend that arm. (R. at 50, 51.) He said this arm would lock and immediately begin to go numb in his fingers and thumb, but he denied any numbness and tingling in his right arm. (R. at 50.) He stated he was not sure he could carry a gallon of milk with his left hand without exacerbating his pain or losing grip and grasp. (R. at 50.) According to Richardson, his pain and emotional issues caused difficulty with concentration and focus. (R. at 51.)

Chelsea Parker, a vocational expert, was present and testified at Richardson's hearing. (R. at 54-60.) Parker classified Richardson's past work as a truck driver as medium[6] and semi-skilled, as generally performed, but very heavy[7] as performed by Richardson. (R. at 55.) She was asked to consider a hypothetical individual of Richardson's age, education and work history, who had the residual functional capacity as ultimately found by the ALJ. (R. at 55-56.) Parker stated such an individual could not perform Richardson's past work, either as generally or actually performed, but other work existed in significant numbers, including jobs as a

---

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

[7] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can do very heavy work, he also can do heavy, medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2020).

garment folder, a sorter and a marker, that such an individual could perform. (R. at 56-57.) She testified that an individual who either would be off task more than 10 percent of the workday or would be absent two or more days monthly, could not perform any work. (R. at 58-59.) Lastly, Parker testified that the first hypothetical individual, but who was limited to using the left upper extremity less than occasionally for handling objects and for gross and fine manipulation, could not perform any work. (R. at 59-60.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Leonard Simpson, M.D., a state agency physician; Leslie E. Montgomery, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Weatherford Regional Medical Center; North Carolina Regional Physicians Neuroscience Center; Regional Physicians; The Rehab Center at Thomasville; Greensboro Spine and Scoliosis Center; Earnest Clinic, Inc.; Wake Forest University Baptist Medical Center, ("Wake Forest"); Spine and Scoliosis Specialists; Cornerstone Family Medicine; William A. Davis Clinic; The Health Wagon; Psychiatric Associates of the Virginias; Susan Fogg, M.S.; Tri State Occupational Medicine, Inc.; Dr. Philip Robertson, M.D.; Washington Square Clinic; Clinch Valley Medical Center; Dr. Ravi Titha, M.D.; and Associated Pain Specialists.

The following facts are included to provide background information leading up to Richardson's current claims. They were obtained from the prior ALJ's decision, dated June 14, 2017. *See Richardson v. Berryhill*, Civil Action No. 1:18cv00033 (Docket Item No. 7-2 at 32-35). Richardson was involved in a work-related motor vehicle accident on September 7, 2011, resulting in an acute lumbar

strain; an acute dorsal sprain; a left scapula abrasion; and a left shoulder contusion. Left shoulder x-rays were normal, and lumbar spine x-rays showed mild degenerative disc space narrowing. Richardson received chiropractic care during September 2011, after which he reported improved neck and back pain. In October 2011, he was diagnosed with cervical spondylosis/stenosis with left C7 radiculopathy; a left shoulder injury; and lumbar pain; and a cervical MRI revealed mild central stenosis and mild to moderate bilateral foraminal stenosis, secondary to bone spurring; and a small, central disc protrusion with bilateral, mild to moderate foraminal stenosis. From October to December 2011, Richardson exhibited left shoulder tenderness with some decreased range of motion, tenderness in the cervical and lumbar spine, but with normal range of motion, some decreased sensation in all extremities and give way weakness in the left arm and left anterior tibia. An electromyogram, ("EMG"), and nerve conduction studies in December 2011 were normal. In February 2012, Richardson was referred for physical therapy for treatment of cervical, left shoulder, thoracic and lumbar pain and weakness, which he attended through March 2012. X-rays showed lumbar spine degenerative disc disease and minimal degenerative changes of the cervical spine. Diagnoses included a healing left deltoid tear; left shoulder rotator cuff bursitis; cervical strain with underlying spondylosis and aggravation of left upper extremity radiculopathy; and lumbar degenerative disc disease with mild left lower extremity radiculopathy. Richardson received a shoulder injection, resulting in near immediate improvement. Also in March 2012, he received lumbar injections for his back pain, resulting in little relief, and in May 2012, he received a facet injection, which worsened his pain. Surgical intervention was not recommended.

A functional capacity evaluation, dated June 22, 2012, indicated Richardson could perform sedentary work[8] and that his pain rating of 10 was not supported by objective findings. In July 2012, Richardson's examination was normal, except for a positive impingement sign of the left shoulder. Later that month, he had normal movement in all extremities and normal range of motion in the cervical spine and lumbar spine, but with pain, as well as decreased sensation in the left arm. He was diagnosed with bulging cervical and lumbar discs. In August 2012, Richardson continued to exhibit normal extremity movement, but tenderness to palpation of the left acromioclavicular, ("AC"), joint and pain on motion of the left shoulder. He was diagnosed with cervical radiculopathy. In January 2013, he exhibited tenderness, pain and muscle spasms in the lumbar spine, but sensory and motor exams were normal.  Beginning in May 2013, Richardson's examinations were normal, including no abnormal musculoskeletal findings, no tenderness to palpation of the neck, normal range of motion, normal gait, no tenderness and normal range of motion of the thoracic spine, no tenderness and normal range of motion of the lumbar spine and no cervical lymphadenopathy and intact motor and sensory exams in all extremities.[9]

### A.  Physical Impairments During the Relevant Time

In a September 8, 2018, Function Report, Richardson stated he lived with

---

[8] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

[9] In January 2017, Robinson did exhibit decreased range of motion in the left arm and tenderness of the cervical spine and lumbar spine, but no evidence of muscle spasm.

his girlfriend and spent most of the day leaned back in a recliner due to back pain, but had to alternate between sitting and standing. (R. at 360.) He stated he watched television and occasionally walked his girlfriend's dog. (R. at 360-61.) Richardson reported cooking, with assistance, approximately every other day, but he denied performing any housework or yardwork due to both pain and depression. (R. at 362-63.) He stated he went outside daily, he could drive, he could go out alone, and he grocery shopped in stores weekly. (R. at 363.) Richardson reported he could pay bills, count change, handle a savings account and use a checkbook. (R. at 363.) He stated he did not spend time with others, but he denied having problems getting along with others, and he denied ever being fired from a job due to such issues. (R. at 364-66.) However, Richardson indicated some issues with authority figures, noting confrontations with police officers. (R. at 366.) He reported difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and stair climbing, as well as issues with memory, focus, task completion, concentration and following instructions. (R. at 365.) Richardson estimated he could walk 15 to 20 minutes before needing to stop and rest for two hours. (R. at 365.) He reported no issues paying attention or following written instructions, but difficulty remembering spoken instructions. (R. at 365.) Richardson stated he did not handle stress well, noting panic attacks and increased anxiety. (R. at 366.) He did not indicate that he used a cane or any other type of assistive device. (R. at 366.)

On November 16, 2018, Dr. Deidre Parsley, D.O., completed a consultative examination at the request of Disability Determination Services. (R. at 761-67.) Richardson described "constant," radiating back pain, worse on the left; weakness in his back and legs; and neck pain that radiated into his shoulders. (R. at 761.) He stated he had undergone physical therapy, injections and chiropractic treatment for his neck, back and shoulder pain, he took Neurontin for pain, and cortisone shots

helped his shoulder. (R. at 761-62.) Richardson stated his shoulder would grind and pop, and he had been diagnosed with arthritis and bursitis. (R. at 762.) According to Richardson, MRIs showed cervical degeneration and spurs, as well as lumbar herniation and bulging discs. (R. at 761.) Dr. Parsley noted diagnostic testing from 2011, including a normal left upper extremity EMG, normal left shoulder x-rays, x-rays of the lumbosacral spine showing slight degenerative disc space narrowing at the L5-S1 level and a cervical spine MRI showing multi-level degenerative changes. (R. at 763.) Richardson also reported left thumb and index finger numbness when raising the left arm, as well as difficulty lifting, carrying and reaching overhead with the left arm. (R. at 762.) Lastly, Richardson reported pain in the left hand, hips, left knee, ankles and left foot, as well as bilateral ankle swelling. (R. at 762.)

On examination, Richardson exhibited normal gait; no difficulty getting on and off the exam table; he did not require a handheld assistive device; he was stable at station and comfortable in the supine and sitting positions; he had +1 pitting edema from the mid legs to the ankles; there was left shoulder tenderness; he had 4/5 grip strength, bilaterally; there was no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet; there was tenderness to palpation of the lower cervical spinous processes, but no tenderness of the paracervical musculature; he had normal curvature of the dorsolumbar spine, but no evidence of muscle spasm; there was tenderness to palpation of the lumbar spinous process and upper paralumbar musculature, bilaterally; straight leg raise testing was positive on the left; he had difficulty standing on the left leg; there was no hip joint tenderness, redness, warmth, swelling or crepitus; there was full muscle strength in the right upper and lower extremities, but 4/5 muscle strength in the left upper and lower extremities; there was no evidence of atrophy; sensation was intact; deep tendon reflexes were +1/4 in the bilateral triceps, biceps, brachioradialis, patellar and left

Achilles, and 2/4 in the right Achilles; cerebellar function was intact; he was able to walk on the heels without difficulty; he could walk on the toes of the right foot, but not the left foot; and he was able to tandem walk, but could only complete a half squat due to low back pain. (R. at 763-65.) Intellectual functioning was normal; hearing was adequate; he was alert and fully oriented; his mood was euthymic with a congruent affect; thought process was appropriate; general fund of knowledge was good; he was cooperative; and he put forth his best effort during testing. (R. at 763, 766.)

Dr. Parsley diagnosed Richardson with, among other things, chronic cervicalgia; chronic lumbago; chronic left shoulder pain; and peripheral edema, and she noted the objective findings were suggestive of possible radiculopathy affecting the left lower extremity. (R. at 765-66.) Dr. Parsley deemed Richardson's prognosis, with treatment, as good, but without treatment, as fair. (R. at 766.) She opined he could sit, stand and walk for six hours each during an eight-hour workday; lift and carry up to 10 pounds frequently and up to 30 pounds occasionally; he could not reach overhead with the left arm; he could grasp, grip, handle and feel with the hands frequently; he was unable to squat; he was limited in bending at the waist; and there were no environmental workplace limitations for temperatures, noise, heights or driving. (R. at 766.)

Richardson saw Dr. Ravi K. Titha, M.D., to establish new patient status, on December 5, 2018. (R. at 782.) His main symptoms were radiating low back pain; pain and swelling in the lower extremities, more on the left; and calcific tendonitis of the left shoulder. (R. at 782.) On examination, Richardson had a full range of neck motion; diminished lower extremity peripheral pulses; normal motor strength in all extremities; intact sensation; normal range of cervical spine motion; no lumbosacral

spine tenderness; and a normal upper back exam. (R. at 783.) Dr. Titha diagnosed, among other things, intervertebral lumbar disc displacement; left leg pain; calcific tendonitis of the left shoulder; and generalized edema. (R. at 783.) On January 7, 2019, Richardson rated his back pain as a 10 on a 10-point scale. (R. at 781.) Physical examination was unchanged, and Dr. Titha continued Richardson on Neurontin. (R. at 780-81.) On February 6, 2019, Dr. Titha agreed to Richardson's request for a back MRI. (R. at 778-79.) His examination was unchanged, and Dr. Titha prescribed Zanaflex in addition to Neurontin. (R. at 778-79.)

On January 24, 2019, Dr. Leonard Simpson, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Richardson could perform light work with no more than frequent balancing and no more than occasional climbing, stooping, kneeling, crouching and crawling. (R. at 103-04.) He further opined Richardson could not reach overhead with the left arm. (R. at 104.) Dr. Simpson did not impose any visual, communicative or environmental limitations. (R. at 104.) On February 7, 2019, Dr. Robert McGuffin, M.D., another state agency physician, completed a physical residual functional capacity assessment, which mirrored that of Dr. Simpson. (R. at 142-44.) Likewise, on February 13, 2019, Dr. McGuffin completed another physical residual functional capacity assessment, consisting of the same findings. (R. at 163-65.)

On March 7, 2019, at Richardson's request, Dr. Titha administered a steroid injection for his back pain, she ordered an MRI and refilled his Neurontin. (R. at 776-77.) On April 8, 2019, Richardson rated his back pain as an eight on a 10-point scale. (R. at 774-75.) Again, his examination was unchanged, and Dr. Titha continued Zanaflex and Neurontin. (R. at 774-75.) On May 7, 2019, Richardson was doing "fairly good," and he rated his back pain as a seven to eight, stating Neurontin

provided pain relief. (R. at 772.) Dr. Titha continued Zanaflex and Neurontin. (R. at 773.)

On April 23, 2019, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a physical residual functional capacity assessment of Richardson, finding he could perform light work that did not require any climbing of ladders, ropes or scaffolds, crawling or overhead reaching with the left arm; no more than frequent balancing and no more than occasional climbing of ramps and stairs, stooping, kneeling or crouching; and that did not require concentrated exposure to extreme cold or vibrations. (R. at 208-10.) Dr. Beazley further opined Richardson would require the ability to alternate between sitting and standing/walking at least every two hours for 15 minutes, which could be accomplished with a regular break schedule. (R. at 209.)

Richardson continued treating with Dr. Titha from June 2019 through January 2020. Over this time, his physical examinations remained unchanged and normal. (R. at 770, 821, 823, 825, 827, 829, 831, 834, 836.) An MRI, dated June 19, 2019, showed moderately severe bilateral foraminal stenosis at the L4-L5 and L5-S1 levels, secondary to disc osteophyte complexes, as well as mild bilateral foraminal stenosis at the L3-L4 level. (R. at 787-88.) In July 2019, Dr. Titha continued Zanaflex and Neurontin. (R. at 837.) In August 2019, at Richardson's request, Dr. Titha referred him to a pain clinic. (R. at 834-35.) Although she noted Neurontin was not helping that much, she refilled Richardson's prescription. (R. at 835.) In September 2019, Richardson reported he tried to tolerate his back pain, for which he had been taking Neurontin and Fioricet, and he also discussed symptoms of depression and headaches. (R. at 831-32.) Dr. Titha added depressive episodes to Richardson's diagnoses, and she refilled his medications. (R. at 831-32.)

On October 14, 2019, Dr. Titha completed a physical assessment of Richardson, finding he could lift/carry up to 10 pounds occasionally and five pounds frequently; stand/walk for a total of two hours in an eight-hour workday, but for 20 minutes at a time; sit for a total of four hours in an eight-hour workday, but for one hour at a time; occasionally climb, stoop, kneel, balance, crouch and crawl; and he had no environmental limitations. (R. at 806-08.) Dr. Titha further opined Richardson would be absent more than two workdays monthly. (R. at 808.) When he returned to Dr. Titha on November 6, 2019, Richardson reported his back pain was helped by medications, which Dr. Titha refilled. (R. at 825-26.) In December 2019, although Richardson complained of pain in his back, hips and thighs, Dr. Titha noted his pain control was "fairly good" with Neurontin and Fioricet together, both of which she refilled. (R. at 823-24.) In January 2020, Richardson reported he had developed headaches "off and on." (R. at 821.) He rated his back pain as a 10 on a 10-point scale, but tolerable with medications. (R. at 821.) Dr. Titha added chronic cluster headaches, not intractable, to Richardson's diagnoses, and she refilled his medications. (R. at 821.)

Richardson saw Jennifer Stacy, F.N.P., a family nurse practitioner at Associated Pain Specialists, on December 2, 2019, to establish care for chronic pain management. (R. at 809.) He described constant, radiating back pain with associated numbness and tingling. (R. at 809.) Richardson stated Neurontin helped his pain, but physical therapy and cortisone/epidural/facet injections did not. (R. at 809.) Richardson reported his average, as well as his current, pain level was a five on a 10-point scale. (R. at 809.) He also complained of ankle swelling and feeling nervous, depressed and having sleep disturbances. (R. at 810.) On examination, Richardson was fully oriented with no attention abnormalities; he had moderate tenderness of the lumbosacral spine to palpation, bilaterally, as well as decreased

range of motion and positive straight leg raise testing; and he had an antalgic gait. (R. at 811.) A urine drug screen was consistent with Richardson's current prescriptions. (R. at 812.) Stacy diagnosed inadequately controlled lumbago. (R. at 812.) When Richardson returned on December 30, 2019, a urine drug screen did not reflect the prescribed Klonopin. (R. at 839, 848.) In addition to his low back pain, Richardson also complained of neck pain that radiated into the left shoulder, arm and hand with numbness and tingling. (R. at 845.) He reported poor sleep due to pain, and he stated his psychiatrist had prescribed Cymbalta. (R. at 845.) Richardson rated his average and current pain level as a six on a 10-point scale. (R. at 845.) On examination, he had mild to moderate tenderness to palpation of the sacrum and iliolumbar region, bilaterally, as well as moderate tenderness to palpation along the facet column, bilaterally; he had a normal gait and stance; he was fully oriented; and he had no attention abnormalities. (R. at 847.) Courtney Carroll, F.N.P., a family nurse practitioner, diagnosed inadequately controlled vertebral osteophyte, lumbar spinal stenosis and intervertebral disc stenosis of the neural canal of the lumbar region. (R. at 848.) She prescribed hydrocodone-acetaminophen. (R. at 848.)

When Richardson returned to the pain clinic on January 22, 2020, he reported 60 percent pain relief for three to four hours with the pain medication, which allowed him to sit, travel, go shopping and walk easier and with less pain. (R. at 850.) He rated his average pain as a six on a 10-point scale, with his current level being a five, and he reported sleeping well. (R. at 850.) Richardson continued to endorse lower back pain, radiating into the legs with muscle spasm and back stiffness; tingling and numbness in both feet; and feeling nervous and depressed, but without suicidal or homicidal ideation. (R. at 852.) Physical examination was the same, except the following additional findings were noted: straight leg raise testing was positive, bilaterally; Sicard's test was positive, bilaterally; there was mild to moderate

tenderness to both hips on palpation of the piriformis muscles; sensation was decreased in the knees, legs, feet and thighs; and there was no lower extremity weakness. (R. at 852-53.) A urine drug screen was positive for tetrahydrocannabinol, ("THC"),[10] but negative for the prescribed hydrocodone. (R. at 853.) Richardson's diagnoses remained the same, Carroll scheduled a translaminar lumbar epidural steroid injection, and she refilled his pain medication. (R. at 854.)

### B. Mental Impairments During the Relevant Time

During the time relevant to his current claims, Richardson treated at Psychiatric Associates of the Virginias from March 2017 through September 2018. On March 14, 2017, he noted that an increased dosage of Prozac helped, but he continued to struggle with anxiety, he had a decreased appetite, resulting in a 10-pound weight loss, and he had sleep issues due to nightmares. (R. at 737.) On mental status examination, Richardson was well-groomed and oriented with a guarded attitude and anxious mood; he had calm motor activity; normal speech; no hallucinations or delusions; no homicidal or suicidal ideations; intact thought process; no impairment in self-perception; and intact general knowledge, abstraction, memory and insight. (R. at 737.) Dr. Philip Robertson, M.D., a psychiatrist, diagnosed major depressive disorder; PTSD; and chronic pain syndrome. (R. at 737.) He continued Richardson on Wellbutrin, Klonopin, Neurontin and Prozac, and he prescribed Prazosin for nightmares. (R. at 737.) On June 12, 2017, Richardson reported the Prazosin "really helped a lot," noting better sleep, but he requested an increased dosage of Prozac for panic attacks. (R. at 735.) Mental status examination was the same, except Richardson's attitude was

---

[10] Richardson stated he had been using a cannabidiol, ("CBD"), product. (R. at 855.)

cooperative, and he had a moderately depressed mood with congruent affect. (R. at 735.) Dr. Robertson increased the dosage of Prozac and Prazosin. (R. at 735.) On October 9, 2017, Richardson reported he felt he was regressing and becoming more depressed, socially withdrawn and avoidant, lacking energy and motivation and feeling worthless. (R. at 714, 733.) He remained convinced he could not return to work and was frustrated by the denial of his disability claims. (R. at 714.) Richardson's mental status examination was unchanged. (R. at 733.) Dr. Robertson found that both Richardson's psychiatric and physical impairments were chronic, his prognosis for recovery was guarded, and his prognosis for return to work as a truck driver was poor. (R. at 714.) This same day, Dr. Robertson completed a mental assessment, finding Richardson had no[11] limitations in his ability to follow work rules and to maintain personal appearance; mild[12] limitations in his ability to use judgment in public, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions and to behave in an emotionally stable manner; moderate[13] limitations in his ability to relate to co-workers, to deal with the public, to maintain attention/concentration, to understand, remember and carry out both detailed and complex job instructions and to relate predictably in social situations; and marked[14] limitations in his ability to deal with work stresses and to demonstrate reliability. (R. at 719-21.) Dr. Robertson also found Richardson would be absent more than two workdays monthly. (R. at 721.)

---

[11] No limitations are defined as absent or minimal limitations that are transient and/or expected reactions to stresses. (R. at 719.)

[12] Mild limitations are defined as slight limitations, but the individual can generally function well. (R. at 719.)

[13] Moderate limitations are defined as more than slight limitations, but the individual still is able to function satisfactorily. (R. at 719.)

[14] Marked limitations are defined as serious limitations, resulting in a substantial loss in the ability to effectively function, causing unsatisfactory work performance. (R. at 719.)

On January 4, 2018, Richardson reported that Viibryd helped his moods, but he stopped taking it due to weight gain. (R. at 732.) He stated he felt ok without it, and he reported his sleep was "ok" on Prazosin. (R. at 732.) Mental status examination was unchanged, except Richardson's mood was depressed and anxious with a blunted affect, and he endorsed suicidal ideations. (R. at 732.) By April 3, 2018, he reported he was "not doing the best," noting increased anxiety due to awaiting a disability appeal decision, as well as having some panic attacks. (R. at 731.) He stated his sleep varied depending on pain and anxiety, but he reported nightmares were "good" on Prazosin. (R. at 731.) Mental status examination was unchanged, except his mood was anxious, and he denied suicidal ideations. (R. at 731.) Richardson admitted using THC. (R. at 731.) Shanna Autrey, P.A.-C, a certified physician assistant, prescribed a trial of BuSpar. (R. at 731.) On July 2, 2018, Richardson reported his psychiatric medications were effective and tolerable, although he stopped taking BuSpar because it made him feel "drunk." (R. at 730.) He stated his sleep was erratic, but Prazosin stopped his nightmares; his appetite was good, and his weight was stable. (R. at 730.) Mental status examination was unchanged, except Richardson's mood was anxious and depressed, and he reported fleeting suicidal thoughts, without plan or intent. (R. at 730.) Richardson reported he did not care whether he lived or died. (R. at 730.) On September 26, 2018, he reported that Wellbutrin had really been helping, but he continued to have mood swings and wished to try Abilify. (R. at 752.) Richardson was having no nightmares, his sleep was varied, but "good," and his appetite was "good" with stable weight. (R. at 752.) Mental status examination was unchanged, except Richardson's mood was euthymic. (R. at 752.) He, again, admitted to using THC. (R. at 752.) Autrey diagnosed increased depression, and a trial of Abilify was prescribed. (R. at 752.)

On November 14, 2018, Susan Fogg, L.P.C., a licensed professional counselor, completed a psychological evaluation at the request of Disability Determination Services. (R. at 754-57.) A friend drove Richardson to the appointment, and he reported he did not drive, which inhibited his traveling. (R. at 754.) He reported he had brain damage from his prior motor vehicle accident and was unable to work as a long-distance truck driver, which left him feeling "lost." (R. at 754.) Richardson also reported thoughts of suicide after his motor vehicle accident, but had not acted on them for fear of upsetting his family, with whom he had good relationships. (R. at 754.) He stated he struggled to make friends because he did not know what to say to others. (R. at 754.) Richardson described his current symptoms to include difficulty focusing, panic attacks, daily depression, failure to understand instructions, not always understanding what is being said to him and difficulty controlling his anger. (R. at 754-55.) On mental status examination, he was clean and neat, fully oriented and calm, but he had a flat affect and expressed anxiety. (R. at 754-55.) Richardson denied hallucinations, and he exhibited no delusions, bizarreness of thought content, looseness of associations or mania. (R. at 755.) Speech was rational, slow and sluggish, and memory for dates, sequences of events and factual details in his life was poor. (R. at 755.) Richardson struggled to focus on questions, he was unable to give the date or the name of the president, he could not remember three words after three minutes, he had difficulty with cognition, memory and judgment, his flow of thought was sluggish, he could not spell "world" backwards, he could not understand abstract thought and meaning, he was unable to perform Serial 3s or Serial 7s, and insight and perception were poor. (R. at 755.) Richardson reported sleeping about three hours nightly, resulting in little energy, difficulty concentrating and irritability, which sometimes led to anxiety attacks. (R. at 755.) He also reported having bad dreams from the motor vehicle accident. (R. at 755.) Richardson stated he could not follow instructions on tasks or household

chores, which was very frustrating. (R. at 755.) He stated his family maintained his schedule, finances and transportation. (R. at 755.)

Fogg opined Richardson had borderline intellectual functioning, and she stated he was, at best, depressed and anxious. (R. at 756.) She opined Richardson's mental health issues would interfere with his ability to establish a normal routine, including maintaining employment. (R. at 756.) Fogg opined Richardson most likely would not be able to carry out work instructions or be able to support a normal workweek, including attendance, supervision and any task requiring problem solving, multi-tasking or being part of a working unit. (R. at 756.) She diagnosed depressive disorder; generalized anxiety; and borderline intellectual functioning, and she deemed Richardson's prognosis as guarded. (R. at 756.) Fogg further opined he would not be able to establish an independent lifestyle, and, therefore, may be at the mercy of others in the right circumstances. (R. at 756.) She, therefore, opined it was doubtful Richardson could maintain employment. (R. at 756.)

On January 2, 2019, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Richardson had moderate limitations in the ability to understand, remember or apply information, to interact with others and to adapt or manage himself; and marked limitations in the ability to concentrate, persist or maintain pace. (R. at 101.) Leizer also completed a mental residual functional capacity assessment, finding Richardson was moderately limited in his ability to sustain an ordinary routine without special supervision, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others; and markedly limited in his ability to understand, remember and carry out detailed

instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 105-07.) In all other areas, Leizer opined Richardson was not significantly limited. (R. at 105-06.) Leizer completed another PRTF on February 7, 2019, finding Richardson had moderate limitations in his ability to understand, remember or apply information, to interact with others and to concentrate, persist or maintain pace; and a mild limitation in his ability to adapt or manage himself. (R. at 140.) He also completed a mental residual functional capacity assessment, this time finding no marked limitations, but that Richardson was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (R. at 144-46.) In all other areas, he found Richardson not significantly limited. (R. at 145-46.) Leizer found that Richardson could remember simple instructions and complete simple, repetitive tasks, and while he would have difficulty interacting with the public and co-workers more than occasionally, he could work independently. (R. at 145-46.) On February 12, 2019, Leizer completed a third PRTF, which mirrored his previous one. (R. at 161.) He also completed another mental residual functional capacity assessment, which contained the same findings as his February 7, 2019, assessment, except he

also found Richardson was moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 165-67.)

On April 23, 2019, Leslie E. Montgomery, Ph.D., a state agency psychologist, completed a PRTF, finding Richardson had moderate limitations in his ability to understand, remember or apply information, to interact with others, to concentrate, persist or maintain pace and to adapt or manage himself. (R. at 205-06.) In a mental residual functional capacity assessment, Montgomery found Richardson was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 211-13.) In all other areas, Richardson was found to be not significantly limited. (R. at 211-12.)

Richardson continued to treat with Dr. Robertson through August 2019. Over this time, he continued to be well-groomed, cooperative and fully oriented, with

calm motor activity;[15] he had no hallucinations or delusions; intact general fund of knowledge, thought process, judgment and memory; his mood ranged from depressed, anxious and dysphoric to euthymic, with a congruent or appropriate, but constricted, affect; he had poor energy; he expressed social withdrawal and avoidance; and he had impaired insight. (R. at 790-91, 793, 795, 797, 799.) Richardson mostly denied suicidal ideation, but in November 2018, he reported fleeting, passive suicidal thoughts without plan. (R. at 799.) Over this time, some of Richardson's medications were adjusted. In November 2018, he stated he was doing "okay," (R. at 799); in March 2019, he stated he was not well, noting he was depressed and thought Abilify had worsened his condition, (R. at 797); in April 2019, he reported no change, stating he still was depressed and irritable, noting Rexulti did not help, (R. at 795); in May 2019, he, again, stated he was no better, noting Ativan did not help his anxiety, although Wellbutrin helped his mood, (R. at 793); in June 2019, he stated medications helped, as he was less irritable, and his mood was "fair," (R. at 791); and in August 2019, he reported he was "a little better," stating he had been more active, taking walks and hikes, and noting Seroquel helped to calm him. (R. at 790.) In May 2019, Dr. Robertson referred Richardson for counseling, but the following month, he advised he was unable to get an appointment. (R. at 791, 793.) Over this time, Richardson reported that medication helped his sleep and controlled his nightmares. (R. at 791, 793, 795, 797, 799.)

Dr. Robertson completed an assessment of Richardson's work-related mental abilities on May 21, 2019, finding he was mildly limited in his ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance; moderately limited in his ability

---

[15] On May 21, 2019, Dr. Robertson noted that Richardson jiggled his leg. (R. at 793.)

to relate to co-workers, to use judgment in public, to interact with supervisors, to maintain attention and concentration, to understand, remember and carry out both detailed and complex job instructions, to behave in an emotionally stable manner and to demonstrate reliability; and markedly limited in his ability to deal with the public, to deal with work stresses and to relate predictably in social situations. (R. at 800-02.) He opined Richardson would miss more than two workdays monthly. (R. at 802.)

On November 11, 2019, Richardson told Dr. Robertson he had stopped using marijuana and was "more symptomatic," including restless sleep with increased nightmares. (R. at 820.) However, he reported a better mood and no suicidal ideation. (R. at 820.) Richardson stated he thought Klonopin was more effective than Xanax, and he requested an increased dosage. (R. at 820.) On mental status examination, he was well-groomed, fully oriented and cooperative, with calm motor activity; he had a mildly depressed and anxious mood with a constricted affect; and he had normal speech. (R. at 820.) Dr. Robertson assessed anxiety due to cannabis withdrawal syndrome, and he continued Wellbutrin, increased the Prazosin dosage, discontinued Xanax and Seroquel and restarted Klonopin. (R. at 820.) By December 9, 2019, Richardson reported Klonopin was no better than Xanax, and he complained of not sleeping, not having a lot of energy and having nightmares. (R. at 818.) However, he, again, stated Wellbutrin helped his mood some. (R. at 818.) Dr. Robertson noted Richardson's mental status was "stable," and on examination, it was noted he was less depressed; he had intact thought process; no impairment in self-perception; and intact memory, judgment and insight. (R. at 818.) Otherwise, the examination was the same. (R. at 818.)

On January 14, 2020, Dr. Robertson completed another work-related mental assessment of Richardson, finding he had no limitations in his ability to follow work rules and to maintain personal appearance; mild limitations in his ability to use judgment in public and to understand, remember and carry out simple job instructions; moderate limitations in his ability to relate to co-workers, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations; and marked limitations in his ability to deal with the public, to deal with work stresses, to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 814-16.) Dr. Robertson opined Richardson would be absent more than two workdays monthly. (R. at 816.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Richardson argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) In particular, he argues the ALJ erred by rejecting the opinions of Drs. Robertson and Titha, as well as the January 2019 opinion of state agency psychologist Leizer, instead relying on the opinions of the other state agency reviewers. (Plaintiff's Brief at 7-8.) Lastly, Richardson argues the ALJ failed to appropriately consider the prior ALJ's decision, limiting him to sedentary work. (Plaintiff's Brief at 6-7.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign

an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[16]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or

---

[16] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2020).

prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2020).[17] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly

---

[17] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

The ALJ found Richardson had the physical residual functional capacity to perform light work with a sit/stand option that required no more than occasional overhead reaching with the left arm; no more than frequent overhead reaching with the right arm and in all other directions with both arms; no more than frequent balancing, kneeling and exposure to dust, odors, fumes and pulmonary irritants; no climbing of ladders, ropes or scaffolds; and no more than occasional climbing of ramps and stairs, stooping, crouching, crawling and operating a motor vehicle. (R. at 18.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2020). The residual functional capacity assessment is based on all the relevant evidence, including the medical records, medical source opinions and the individual's subjective allegations and description of his own limitations. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The court first notes that, contrary to Richardson's argument, the ALJ was not bound by the prior ALJ's residual functional capacity finding, limiting him to sedentary work. Instead, as the Commissioner states in her brief, a change is warranted when substantial evidence supports such a change. *See Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 477-78 (4th Cir. 1999); *see also* AR 00-1(4), 2000 WL 43774, at * 4 (Jan. 12, 2000) (stating an ALJ must consider an ALJ's prior finding, but may give less weight to that finding when the evidence provides a basis

for making a different finding with respect to the period being adjudicated in the subsequent claim). The ALJ "must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances" in the claimant's subsequent case. AR 00-1(4), 2000 WL 43774, at *4. Specifically, the ALJ must consider the following: "(1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the second claim." AR 00-1(4), 2000 WL 43774, at *4.

Here, the ALJ acknowledged the prior ALJ's finding that Richardson was limited to a range of sedentary work following his motor vehicle accident, but "new and material evidence" showed his condition "stabilized" and "even improved in some ways." (R. at 27.) In particular, the ALJ found a sedentary residual functional capacity no longer was warranted because the medical examination findings showed only "some limited back-related pain and limitations," but were otherwise "within normal limits." (R. at 27.) The ALJ also noted that the record did not support Richardson's testimony that he was prescribed a cane and used a walking stick, as there is no evidence in the record that a cane was prescribed, Richardson did not use an ambulatory assistive device during appointments, and he had a normal gait and stance. (R. at 27.) Thus, the ALJ afforded the prior decision "only some weight" and did not adopt the sedentary residual functional capacity. (R. at 28.) Instead, the ALJ explained that Richardson had the residual functional capacity for a range of light work during the period at issue, noting that a consultative examiner and three state

agency physicians made such a finding; medical examinations showed normal arm and leg strength, no lumbar tenderness, normal neck range of motion and intact sensation; and treatment notes showed his medications provided good pain relief. (R. at 772-73, 809, 823-26, 850.) For these reasons, I find the ALJ's decision to deviate from the prior sedentary residual functional capacity finding is supported by substantial evidence. Additionally, despite Richardson's argument that his "degenerative impairments worsen[ed] with time," the evidence of record does not support such a conclusion. In particular, as the Commissioner states in her brief, Richardson fails to appreciate that the passage of time from the 2011 motor vehicle accident likely would result in improvement of his condition, which is reflected in the medical records and discussed in more detail below.

As for the opinion evidence, the ALJ found Dr. Titha's opinions unpersuasive because they were not consistent with the record. (R. at 23.) In October 2019, Dr. Titha opined Richardson could not perform a full eight-hour workday and that he would be absent from work more than two days monthly. (R. at 806-08.) In his decision, the ALJ explained that the imaging contained in the record, as well as Dr. Titha's own physical examination findings, showed full range of neck motion, normal motor strength of all extremities, intact sensation, no extremity edema, active and normal range of motion of the cervical spine, no lower back tenderness, and Richardson appeared in no acute distress. (R. at 23.) The ALJ stated that such findings did not support the extent of the exertional limitations in Dr. Titha's opinion and did not support her finding of excessive absenteeism. (R. at 23.) As the Commissioner stated in her brief, only six days before Dr. Titha completed this assessment, she performed a physical examination of Richardson, finding normal motor strength in all extremities, intact sensation, normal cervical range of motion and no lumbar tenderness. (R. at 827.) The ALJ further noted that the overall record

showed Richardson's back symptoms appeared to be out of proportion to the diagnostic imaging in the record. (R. at 23.) For instance, old diagnostic studies showed mild to moderate findings, and it was not until the June 2019 lumbar MRI that moderately severe findings were reflected, but without any nerve root impingement. (R. at 23.) Additionally, the ALJ correctly stated there were no left shoulder diagnostic studies after 2012, and the 2011 studies were unremarkable. (R. at 23.) While there was some cervical and lumbar tenderness noted in some of the treatment records, Richardson's gait was normal, except for in December 2019, and the more recent treatment records from Dr. Titha do not indicate abnormal findings. (R. at 23.)

The ALJ found the November 2018 opinion of consultative examiner, Dr. Parsley, "generally persuasive," as it largely was consistent with the physical examination findings, diagnostic studies and other evidence of record. (R. at 23.) In addition to the evidence described above, the ALJ noted that, despite the negative diagnostic findings of the left shoulder, Dr. Parsley precluded Richardson from reaching overhead to the left. (R. at 23.) He noted that, while the results of the physical examination noted some findings, Richardson still exhibited 4/5 strength in the left upper extremity, and, therefore, a limitation to occasional overhead reaching to the left was more consistent with the evidence. (R. at 23.) Additionally, the ALJ stated Dr. Parsley's limitation to no squatting was inconsistent with the evidence showing mild to moderate diagnostic back findings, but a moderately severe finding in June 2019, albeit without nerve root impingement. (R. at 23-24.) Thus, the ALJ found Richardson would be able to occasionally stoop and crouch, as set forth in the residual functional capacity finding. (R. at 24.) Conversely, the ALJ noted that, considering Richardson's subjective complaints of pain and the June 2019 MRI

findings, the residual functional capacity finding allowed for reduced standing and walking and an ability to alternate positions during the workday. (R. at 24.)

Next, the ALJ found the January 2019 opinion of state agency physician, Dr. Simpson, "persuasive;" the February 2019 opinions of state agency physician, Dr. McGuffin, "persuasive;" and the April 2019 opinion of state agency physician, Dr. Beazley, "partially persuasive." (R. at 24.) Each of these physicians opined Richardson could perform a range of light work. (R. at 103-04, 142-44, 163-65, 208-10.) With regard to Drs. Simpson and McGuffin, the ALJ noted their opinions generally were consistent with the evidence of record; however, a limitation to occasional overhead reaching to the left, as opposed to no such reaching, was more consistent with the evidence. (R. at 24.) Additionally, he noted that, considering Richardson's subjective complaints of pain and the June 2019 MRI findings, which post-date both of their opinions, his ultimate residual functional capacity finding provided for a sit/stand option, as well as reduced standing and walking. (R. at 24.) With regard to Dr. Beazley, in addition to the reasoning just stated, the ALJ further noted that a limitation to occasional crawling, as opposed to no crawling, was more consistent with the record. (R. at 24.) The ALJ additionally noted Dr. Beazley appeared to contemplate Richardson being off task during the times he would alternate positions, but this was neither supported by the evidence nor necessary in order to provide him with a sit/stand option to perform the jobs identified by the vocational expert. (R. at 24.) Instead, the ALJ stated the vocational expert accounted for a sit/stand option by applying a 50 percent reduction to the number of available jobs in the national economy, and the ALJ concluded that further off-task limitations were not supported. (R. at 24.)

In arriving at his physical residual functional capacity finding, the ALJ correctly stated that the medical evidence of record showed conservative, minimal, routine and sporadic treatment for Richardson's back impairment, which he found did not support the severity of symptoms or degree of limitations alleged. (R. at 28.) He found Richardson's physical injuries from the 2011 motor vehicle accident were moderate, at most. (R. at 28.) Thus, the ALJ concluded the residual functional capacity assessment accommodated Richardson's physical limitations. (R. at 28.) Additionally, the court notes Richardson reported improvement in his pain with medications. (R. at 773, 809, 824, 826, 850.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

With regard to Richardson's mental impairments, the ALJ found he had the residual functional capacity to perform detailed, but uninvolved, tasks, simple work-related decisions, occasional supervision and co-worker interaction, rare public interaction and occasional work setting changes. (R. at 18.) In arriving at this finding, the ALJ found the opinions of Dr. Robertson "partially persuasive." (R. at 25.) Dr. Robertson completed mental assessments in October 2017,[18] May 2019 and January 2020. (R. at 719-21, 800-02, 814-16.) The ALJ found all of Dr. Robertson's assessments "partially persuasive," noting the marked limitations and excessive absenteeism findings were inconsistent with the treatment notes. (R. at 25.) In particular, the ALJ explained that, while Dr. Robertson's treatment notes indicated Richardson had mood swings, and a March 2019 note indicated he had increased

---

[18] In his decision, the ALJ mistakenly referred to the October 2017 assessment as having been completed in March 2016. (R. at 25.) It appears that he did so because the assessment is included immediately after an Initial Psychiatric Diagnostic Evaluation, which was, in fact, completed on March 15, 2016. (R. at 716-18.)

depression, the record also noted times of improvement with medication. (R. at 25.) He further explained that Richardson mentioned having friends, and he lived with his girlfriend; he had a good relationship with his parents, noting he visited his mother weekly; and was able to do some activities of daily living, including walking and hiking, subject to his physical issues. (R. at 25.) The ALJ also stated Richardson testified his medication helped him, and he had not had a nightmare in a year or longer. (R. at 25.) The ALJ noted the March 2016 mental status examination findings, which were prior to the time relevant to Richardson's current claims.[19] (R. at 25.) Nonetheless, the mental status examination findings from October 2017 were equally, if not more, benign, including being well-groomed and fully oriented with a cooperative attitude, calm motor activity and a blunted, but appropriate, affect; intact thought process, judgment and insight; and no hallucinations, delusions or suicidal ideations. (R. at 733.) Dr. Robertson did note Richardson had a depressed mood, as well as soft and monotone speech. (R. at 733.) However, the ALJ noted Richardson could go out alone and drive for extended periods, shop in stores for food and manage his money. (R. at 25.) He concluded the evidence of a depressed mood with some improvement with medication, average intelligence, fair concentration, logical and coherent thought and the ability to engage with friends and family and the public on a basic level supported an ability to deal with others on at least a superficial basis, to maintain concentration, persistence and pace for at least unskilled work tasks, to understand, remember and carry out simple work-related instructions and to adapt and manage himself in a work environment that involved no more than occasional changes in a routine work setting. (R. at 25.) The ALJ

---

[19] These findings included mildly decreased psychomotor activity with a subdued, depressed demeanor; severely depressed mood with stable affect, a very dysphoric quality, tearful at times, constricted range and not reactive; clear and intact sensorium with fair concentration; average intellectual functioning; coherent, logical and goal-directed thought; intact reality testing; no active suicidal thoughts; and fair judgment and insight. (R. at 717.)

further found that the conservative nature of Richardson's mental health treatment with medication also was inconsistent with severe, marked limitations and excessive absenteeism. (R. at 25.)

The ALJ found the November 2018 assessment of consultative examiner Fogg "unpersuasive," as her conclusions were based upon an inaccurate and somewhat misleading presentation by Richardson. (R. at 26.) He further noted this assessment was not supported, as Fogg failed to cite to any of the documentation she claimed supported her conclusions, and the other evidence of record largely was inconsistent with her conclusions. (R. at 26.) Specifically, the ALJ noted that, although Fogg opined Richardson had borderline intellectual functioning, which she said was "supported by documentation," she failed to cite the supporting documentation. (R. at 25.) Moreover, the ALJ stated such a conclusion was contrary to the other record evidence, which failed to mention intellectual functioning being an issue for Richardson. (R. at 25.) In fact, the ALJ stated Richardson's intellect was assessed as average with no more than a moderate limitation on his ability to handle complex work tasks. (R. at 25-26.) He further stated that, just two days after Fogg's examination, Richardson's intellectual functioning was deemed normal, he had a euthymic mood, appropriate thought process and a good fund of knowledge during a physical examination. (R. at 26.) The ALJ also stated that Fogg noted Richardson had documentation to support his claim of mental health issues, but she, again, failed to cite or reference the specific documentation. (R. at 26.) While she also opined Richardson most likely would be unable to carry out work instructions or support a normal workweek, and he might be at the mercy of others in the right circumstances, the ALJ found such conclusions were based almost entirely on Richardson's subjective allegations and his presentation at the examination, during which he presented as if unable to answer basic questions and provided information

thoroughly unsupported by the record. (R. at 26.) In particular, Richardson advised Fogg his motor vehicle accident had resulted in "brain damage," but there are no intelligence tests, neurological findings or other objective evidence in the record to support this. (R. at 26.) Richardson also advised Fogg he did not drive, which is inconsistent with his hearing testimony that he drove 45 minutes to get there, as well as his testimony that he drove about 45 minutes each way to see his psychiatrist every couple of months. (R. at 26.) Richardson further advised Fogg he did not go out alone, but he stated in a Function Report that he could go out alone, that he drove and that he shopped for food in grocery stores. (R. at 26.) Additionally, the ALJ noted that, "contrary to his inept presentation at the examination," he reported being able to pay bills, count change and handle a savings and checking account in the Function Report. (R. at 26.)

The ALJ found state agency psychologist Leizer's January 2019 assessment "partially persuasive," as it contained marked limitations in concentration, persistence or pace, which was inconsistent with the other record evidence, including periods of improvement with medication, benign mental status findings, Richardson's own testimony and reports that he could go out alone and drive for extended periods, grocery shop in stores and manage his money. (R. at 26.) The ALJ found that such evidence supported a moderate limitation in the ability to maintain concentration, persistence or pace and no more than a mild limitation in the ability to adapt or manage himself. (R. at 26.) Moreover, the ALJ stated Leizer appeared to have adopted the findings of Fogg, which, for the reasons stated above, were flawed, without considering the other evidence of record that largely is inconsistent with Fogg's findings. (R. at 26.) Lastly, the ALJ noted Dr. Robertson, Richardson's treating psychiatrist, found no more than a moderate limitation in his ability to perform complex tasks in May 2019. (R. at 26.)

The ALJ found Leizer's February 2019 opinion, as well as the April 2019 opinion of state agency psychologist Montgomery, "persuasive" because they both found no more than moderate limitations in any area of mental functioning, which was consistent with the evidence of record, as stated above. (R. at 27.) However, the ALJ further found Richardson was able to perform detailed, but uninvolved, tasks, rather than being limited to simple, repetitive tasks, as found by Leizer and Montgomery. (R. at 27.) In addition, with regard to Montgomery's opinion, the ALJ noted Richardson was no more than mildly limited in the ability to adapt and manage himself, as opposed to moderately limited as Montgomery found. (R. at 27.) In particular, the ALJ emphasized Richardson was able to go out alone, drive, grocery shop in stores, make and attend medical appointments and manage his money. (R. at 27.)

In arriving at his mental residual functional capacity finding, the ALJ explained that Richardson's mental health treatment had been conservative in nature, consisting of medication management. (R. at 28.) Moreover, the record showed improvement at times with medication, though Richardson continued to have mood swings, and a treatment note from March 2019 reflected increased depression. (R. at 28.) In particular, he testified his mental health medications helped him not think as much about harming himself or others, they kept him stable, and they had stopped his nightmares. (R. at 44.) Likewise, Richardson made similar reports of medication efficacy to his mental health treatment providers. (R. at 730-32 735, 737, 752, 790-91, 793, 795, 797, 799.) Additionally, the ALJ stated the record reflected Richardson had friends, he lived with his girlfriend, he had a good relationship with his parents, and he was able to do some activities of daily living, subject to his physical issues. (R. at 28.) All of this being the case, the ALJ concluded that no more than moderate

mental health limitations were supported, and the mental residual functional capacity finding accommodated Richardson's mental limitations.

For all the above-stated reasons, I find substantial evidence exists to support the ALJ's consideration of the opinion evidence, as well as his resulting residual functional capacity finding and ultimate finding that Richardson was not disabled and not entitled to DIB and SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2.  Substantial evidence exists in the record to support the ALJ's finding regarding Richardson's residual functional capacity; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Richardson was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Richardson's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 2, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE